-Fee Paid

Pro Se Civil Complaint

FILED
CLERK, U.S. DISTRICT COURT
08/13/2026
CENTRAL DISTRICT OF CALIFORNIA
BY bom DEPUTY
DOCUMENT SUBMITTED THROUGH THE ELECTRONIC DOCUMENT SUBMISSION SYSTEM

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF CALIFORNIA

SAJJAD NASIR

Plaintiff(s),

1. Equinix-DC, Inc. (2210584)
2. NATIONAL AUSTRALIA BANK
3. CHINA UNICOM

Defendant(s).

CASE NO. 2:26-cv-09084- RGK - SK

**CIVIL COMPLAINT**

Jury Trial ☒: Yes ☐ No

## I. *PRELIMINARY STATEMENT*

Plaintiff Sajjad Nasir alleges the following:

pleadings pursuant to Rule 8 seeking a civil remedy pursuant to **18 U.S.C. § 1595(a)** alleging violations of the Trafficking Victims Protection Act ("TVPA"), specifically **18 U.S.C. §§ 1590(a)** and **§ 1589**, while designating Defendant Equinix Inc. as principal with Defendant China Unicom under Civil Procedure Rule 20(a).

The Plaintiff seeks court leave for joinder of Defendant National Australia Bank pursuant to Federal Rules of Civil Procedure (Rule 18) for claims of alleged violations of the Trafficking Victims Protection Act ("TVPA"), specifically **18 U.S.C. § 1590(b)**, under Supplemental jurisdiction for Plaintiff's state-law claim pursuant to 28 U.S.C.

Principal defendant Equinix-DC, Inc. (2210584) is incorporated in the State of Delaware and registered in California as a foreign corporation authori eto conduct business, with its head office located within the State of California.

Principal Defendants Equinix Inc. and China Unicom, as shown in statutory SEC filings, are incorporated within the United States and subject to its laws while maintaining offices in Seattle and Washington D.C., and holding Federal Communications Commission cable landing licenses for multiple U.S. and foreign landing stations—including 639 Gardeners Road, Sydney and 2 Tai Seng Avenue—operating through layered shell entities and false identities and engaging in trafficking and forced labor at locations subject to U.S. jurisdiction under **18 U.S.C. § 1596**.

Principal Defendants Equinix Inc. and China Unicom, in order to evade sanctions imposed under the OFAC Chinese Military Enterprise List, operated through multiple layers of shell entities using false identities and fabricated credentials to obscure their involvement and bypass regulatory actions. These shell entities served no legitimate purpose other than to shield the defendants from liabilities, avoid sanctions, and provide new identities to continue evading enforcement measures.

On 3 March 2025, the House Select Committee on China, investigating the national security risks posed by Chinese state-owned telecommunications companies, issued subpoenas to China Unicom seeking information about Points of Presence (PoPs), data centers, and cloud-related services. The shell entities themselves were set up to stage operations that were sustained by running trafficking batches of forced labor, with personnel identities and victim batch information further provided to evade regulatory actions. Both principal defendants actively concealed these facilities through the same shell structure, while also using the infrastructure to route regular trafficking batches. The information obtained from these operations was further exploited to sidestep regulatory actions related to non-compliance and potential license revocations. The Plaintiff was part of the defendants' third trafficking batch, directly linking them to the ongoing scheme.

Defendant National Australia Bank, listed with the SEC and maintaining offices in the United States to sell securities, allegedly violated **18 U.S.C. § 1590(b)** by actively providing assistance to both principal defendants in the trafficking and forced labor scheme. The Bank's involvement included

manipulating financial information and personnel account data of victims by moving cash illegally and fabricating financial transactions to evade SWIFT data scrutiny, thereby hindering and interfering with regulatory oversight in direct violation of **18 U.S.C. § 1590(b)**.

## II. NATURE OF THE ACTION

This is a civil trafficking action brought under **18 U.S.C. § 1595** on behalf of the Plaintiff, who was subjected to and harmed by Defendants' forced labor and trafficking venture operating between September 30, 2024, and June 30, 2025. Plaintiff seeks to recover compensatory and statutory damages caused by Defendants' violations of the Trafficking Victims Protection Act ("TVPA"), specifically **18 U.S.C. §§ 1589** (forced labor) and **1590** (trafficking), and to pursue civil remedies expressly authorized by § 1595. The wrongful conduct alleged herein was carried out through a coordinated joint venture scheme spanning Singapore, Hong Kong, and the United States.

## III. JURISDICTION & VENUE

The Court has jurisdiction over this action pursuant to **28 U.S.C. § 1331** and **18 U.S.C. § 1595(a)**, a federal question, this action arising under the Trafficking Victims Protection Act, specifically **18 U.S.C. §§ 1589** and **1590(a)**.

Subject to Rule 18(b) Joinder of Contingent Claims, supplemental jurisdiction exists for Plaintiff's claims against Defendant National Australia Bank under **18 U.S.C. § 1590(b)** pursuant to **28 U.S.C. § 1367**. The Court also has extraterritorial jurisdiction over involuntary servitude, forced labor, human trafficking, conspiracy, and obstructing enforcement offenses committed overseas pursuant to **18 U.S.C. § 3271** and **18 U.S.C. § 1596**.

Venue is proper pursuant to **28 U.S.C. § 1391(b)** because Defendant Equinix Inc. resides in and maintains offices within this District. In the alternative, complete diversity exists as Defendants are incorporated in different states and maintain offices, and the amount being sought exceeds $75,000.00.

.

## IV. THE PARTIES TO THIS COMPLAINT

### Plaintiff

Sajjad Nasir is an individual residing in New South Wales, Australia. Plaintiff is a victim of trafficking and forced labor, as alleged herein, and brings this action on his own behalf pursuant to **18 U.S.C. § 1595**.

### Defendants

**Defendant Equinix Inc**. is a Delaware corporation with its principal place of business in California, doing business in the State of Washington. Equinix is a citizen of Delaware and California for diversity purposes. Equinix maintains and operates the SYD1 facility (39 Gardeners Road, Alexandria, NSW, Australia), which serves as the originating Foreign Point and co-location infrastructure for international submarine cable circuits—specifically PPC-1—connecting directly to the United States Territory of Guam. Under 47 C.F.R. § 43.82, Defendant China Unicom acts as a Common Carrier and Capacity Holder holding an Indefeasible Right of Use (IRU) or Inter-Carrier Lease (ICL) across these circuits, utilizing Equinix's SYD1 facility to route international telecommunications traffic into United States territorial jurisdiction. Equinix further maintains physical data center operations in this District at its Seattle SE2 facility (The Westin Building Exchange, 2001 Sixth Avenue) and Seattle SE3 facility (2020 Fifth Avenue).

**Defendant National Australia Bank ("NAB")** is a financial institution organized under the laws of Australia, with its principal executive offices located at Level 28, 395 Bourke Street, Melbourne, Australia, and a branch office at 245 Park Avenue, New York, New York. NAB maintains a sponsored Level 1 American Depositary Receipt ("ADR") program in the United States, which trades on the OTC market under the symbol NABZY, with CUSIP number 632525408, and is managed by Deutsche Bank Shareholder Services at 48 Wall Street, New York, New York. NAB has filed registration statements with the Securities and Exchange Commission for its ADR program, including Form F-6 registration statements. NAB has therefore voluntarily submitted to the jurisdiction of the United States by establishing and maintaining an ADR program, appointing a U.S. transfer agent, and filing with the SEC. NAB is also subject to personal jurisdiction in the United States through its New York branch office, as well as its

administration of structured debt facilities, credit lines, and security encumbrances placed upon the revenue streams and operational assets of the U.S.-landing PPC-1 submarine cable system.

**Defendant China Unicom** is a Chinese state-owned enterprise that, through its subsidiary China Unicom (Hong Kong) Limited, is designated on the OFAC Non-SDN Chinese Military-Industrial Complex (CMIC) List under Executive Order 13959, with program tag CMIC-EO13959. China Unicom (Hong Kong) Limited was registered with the U.S. Securities and Exchange Commission as a foreign private issuer, filed annual reports on Form 20-F, and maintained American Depositary Shares (ADSs) listed on the New York Stock Exchange under the ticker symbol CHU US. China Unicom, through its U.S. subsidiary China Unicom (Americas) Operations Limited, is registered with the Federal Communications Commission as a Private Service Provider, maintains a headquarters address at 13800 Coppermine Road, Herndon, Virginia, and has a designated agent for service of process in Washington, D.C. (Robert Stup, Squire Patton Boggs (US) LLP, 2550 M Street, NW, Washington, DC 20037). China Unicom holds capacity rights and licenses under the Cable Landing License Act (47 U.S.C. §§ 34–39) and 47 C.F.R. § 43.82 as a Capacity Holder across transpacific subsea routes. China Unicom maintains physical network hardware and Point-of-Presence operations in this District inside The Westin Building (2001 Sixth Avenue) and 2020 Fifth Avenue in Seattle. China Unicom operates the facility at 2 Tai Seng Avenue, Singapore, which is designated as a Point of Presence (PoP) station and carrier-neutral data center. This facility is the location where Plaintiff was trafficked and forced to perform manual labor. The facility is connected to the FCC-licensed PPC-1 submarine cable system, which lands in Guam, a U.S. territory, and is therefore subject to U.S. jurisdiction. China Unicom is therefore subject to personal jurisdiction in the United States through its SEC registration and NYSE listing, its FCC filings and U.S. subsidiary, its designated agent for service in Washington, D.C., its Virginia headquarters, its local Seattle network footprint, and **its** ownership and operation of a facility connected to an FCC-licensed submarine cable system.

.1

**Service Addresses**

| **Party Type** | **Name** | **Address** |
|---|---|---|
| Plaintiff | Sajjad Nasir | 30 Railway Terrace, Granville NSW 2142, Australia |
| Defendant 1 | Equinix Inc. | Equinix SE3, 2020 Fifth Avenue, Seattle, WA 98121, USA |
| Defendant 2 | China Unicom (Americas) Operations Ltd. | c/o Robert Stup, Squire Patton Boggs (US) LLP, 2550 M Street, NW, Washington, DC 20037, USA |

| | | |
|---|---|---|
| Defendant 3 | National Australia Bank Limited | c/o National Australia Funding (Delaware) Inc., 245 Park Avenue, 28th Floor, New York, NY 10167, USA |

## V. FILING CHORNOLOGY

The Plaintiff's proceedings before the United States District Courts involved a series of procedural events concerning the filing of applications, payment of filing fees, requests for issuance of summons, and subsequent dismissals. The relevant procedural history is set out chronologically below.

**30 May 2026:** Plaintiff filed the complaint action (2:26-cv-01853-LK) in the United States District Court for the Western District of Washington, pro se, together with an application to proceed without prepayment of fees.

**30 May 2026:** The federal district court clerk's office marked the application to proceed without prepayment of fees as defective immediately after filing, thereby obstructing the filing of the complaint and forcing payment of the fee to proceed.

**6 June 2026:** Plaintiff's request for issuance of summons was denied, along with authorization to serve in a foreign country under the Hague Convention.

**14 June 2026:** Plaintiff filed an application for court appointed counsel and a motion for change of venue due to persistent obstruction and hostility from the clerk's office.

**24 June 2026:** Judge Lauren King of the United States District Court for the Western District of Washington dismissed the complaint without prejudice.

**25 June 2026:** The District Court dismissed the application, declined to issue summons, and directed Plaintiff to refile the matter as a new application.

## VI. FACTS OF THE CLAIM

### .1 FACTUAL BACKGROUND LEADING TO DEFENDANTS' ALLEGED TRAFFICKING

The events underlying the alleged conduct occurred against the backdrop of a series of United States regulatory, national security, and telecommunications proceedings involving China Unicom-related entities. As set forth more fully below, those proceedings identified repeated regulatory concerns regarding compliance, national security, foreign ownership, and continued authorization to operate within the United States. Plaintiff alleges that, rather than complying with those regulatory obligations and enforcement measures, Defendants ignored, failed to comply with, or sought to evade them through subsequent conduct, corporate restructuring, and other actions alleged in this Complaint. The following background is provided solely to summarize the regulatory history and factual context preceding the events alleged herein and is not asserted as an independent basis for liability.

Prior to the period beginning in 2020, China Unicom Group maintained a multilayered ownership and operational structure that contributed to regulatory ambiguity within the United States. At the top of the structure, ownership and control remained firmly held by the People's Republic of China through the state-controlled parent entity, China Unicom Group. Beneath the PRC parent, the corporate chain proceeded through China Unicom (A-Share Company), intermediate offshore holding entities in the British Virgin Islands, and China Unicom (Hong Kong) Limited, which served as the publicly traded international arm of the enterprise. This upper-tier ownership structure remained stable and effectively locked throughout the relevant period; the 2011 cross-shareholding transaction with Telefónica S.A. did not modify this control structure, as Telefónica acquired only a minority interest without obtaining operational authority or governance rights. Below the Hong Kong entity, however, the operational footprint in the United States was fragmented across several affiliated entities—such as China Unicom USA Corporation (which held FCC international Section 214 authorizations), China Unicom America, China Unicom International, and China Unicom Global—that operated Points of Presence, routing centers, or wholesale carrier functions without clear corporate lineage in SEC disclosures. Between 2014 and 2015, China Unicom Group transferred its physical tower infrastructure assets into China Tower Corporation, further separating physical asset ownership from operational routing activities. Between 2016 and 2017, U.S. agencies identified discrepancies between the scale of wholesale routing activity conducted through these unlisted entities and the limited declared operations of the formally recognized subsidiary, prompting increased regulatory scrutiny.

In parallel with maintaining this locked upper-tier structure, Defendants intentionally engineered a multi-tiered corporate insulation mechanism designed to segregate legal liability from ultimate operational control across their U.S. and overseas network infrastructure. As reflected in annual disclosures on Form 20-F filed with the U.S. Securities and Exchange Commission (SEC) by China Unicom (Hong Kong) Limited, Defendants routed international operations through offshore British Virgin Islands (BVI) holding entities and unlisted operational subsidiaries—including China Unicom USA Corporation and China Unicom Global. Defendants systematically utilized this segmented listing methodology and shell structure to ensure that physical infrastructure staging, data center operations, and facility staffing were conducted through lower-tier, jurisdictionally isolated entities. By deliberate design, this structure allowed upper-tier parent entities and PRC state controllers to maintain ultimate operational authority over global routing assets while isolating labor sourcing, employment contracts, and facility management from U.S. judicial process, federal regulatory scrutiny, and statutory labor standards. As a result, when federal regulatory enforcement actions commenced, Defendants were structurally positioned to abandon, rebrand, or dissolve these front operating entities without interrupting underlying infrastructure management or exposing parent entities to direct liability for facility-level labor practice

Starting in early 2020, the United States "Team Telecom"—the ad hoc interagency arrangement of the Departments of Justice, Defense, and Homeland Security—determined that state-controlled foreign telecommunications carriers presented unacceptable risks of national security exploitation. Formalized by Executive Order 13913 on April 4, 2020, which established the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector, Executive Branch agencies unanimously recommended that the FCC revoke operating authorizations. These recommendations were grounded in documented cybersecurity vulnerabilities, inaccurate statements made to federal authorities regarding U.S. record storage, inaccurate public representations concerning cybersecurity practices, and operations providing opportunities for PRC state actors to engage in economic espionage and communications misrouting.

By mid-2020 and continuing into 2021, these regulatory findings resulted in formal license revocations and operational cancellations across multiple federal dockets, including GN Docket No. 20-110, ITC-214-20020728-00361, and ITC-214-20020724-00427 (China Unicom Americas), as well as WC Docket No. 18-89. Concurrently, pursuant to Executive Order 13959, the Department of the Treasury's Office of Foreign Assets Control (OFAC) placed China Unicom (Hong Kong) Limited and its associated trading security names on the Non-SDN Chinese Military-Industrial Complex (CMIC) List, including its securities trading in Singapore under ticker K3ID SG, in Hong Kong under 762 HK, and in the United States under

CHU US. These regulatory actions collectively stripped Defendants of their authority to operate within the United States telecommunications sector.

Following these formal license revocations and sanctions listings, Defendants executed a secondary evasion strategy to maintain operational control over their underlying physical network infrastructure while avoiding legal enforcement. Specifically, Defendants created, incorporated, and deployed a network of unlisted 'phantom' entities and fictitious local shell identities across multiple Asia-Pacific (APAC) jurisdictions, layered directly on top of their actual corporate structure. To give these phantom entities the appearance of legitimate, active commercial operations and satisfy local regulatory requirements, Defendants organized, maintained, and validated their operational capacity through batches of trafficked workers. Defendants knowingly recruited, transported across regional borders, harbored, and obtained these workers to perform physical network staging, infrastructure maintenance, and facility operations under forced labor conditions. Defendants subsequently submitted falsified operational profiles regarding these phantom entities to local APAC jurisdictions and federal oversight authorities—including responses provided regarding Points of Presence (POPs), data centers, and cloud facilities inquired about by the U.S. House Select Committee on the Strategic Competition Between the United States and the Chinese Communist Party. Plaintiff has identified and detailed these specific phantom entities and their reliance on forced labor pipelines in disclosures submitted to the U.S. Securities and Exchange Commission (SEC), demonstrating that Defendants knowingly operated this fraudulent structural layer to obscure their ongoing management of U.S.-connected infrastructure

By late 2024, Defendant China Unicom (Hong Kong) Limited was once again subpoenaed by the U.S. House Select Committee on the Chinese Communist Party (Chairman John Moolenaar, Ranking Member Raja Krishnamoorthi) for information seeking substantial records regarding its employees, operations, affiliates, data centers, Points of Presence, and cloud activities still operating in the United States. Similarly, Defendant Equinix, Inc. was subpoenaed by the U.S. Securities and Exchange Commission (SEC Subpoena, March 20, 2024) following a short-seller report published by Hindenburg Research (March 20, 2024), which was subsequently followed by a shareholder class action lawsuit (*In re Equinix, Inc. Securities Litigation*, Case No. 4:24-cv-01680 (N.D. Cal. 2024)). That litigation specifically alleged that (a) Equinix misclassified maintenance expenses as growth capital expenditures to artificially inflate its Adjusted Funds from Operations (AFFO); and (b) Equinix made false and misleading statements about its financial performance and the true state of its business operations. These continued oversight actions, along with related civil and regulatory proceedings, ultimately led Defendants to conspire to evade U.S. sanctions through a novel evasion scheme, where they invented several shell entities and related them

through various corporate relationships to dilute, hide, or disguise the identity of the sanctioned property. Specifically, Defendants China Telecom and China Unicom continued to own and operate their long-standing facility at 2 Tai Seng Avenue, Singapore—a Point of Presence, cloud, and infrastructure hub—by rebranding its four property blocks and showing various shell entities to operate these activities, none of which concealed their affiliation with the PRC while maintaining FCC cable landing authority throughout, utilizing forced labor to perform manual network staging connected to U.S.-landing infrastructure.

.2 **FACTUAL ALLEGATIONS: FRAUDULENT RECRUITMENT, TRAFFICKING, AND FORCED LABOR**

Between September 30, 2024, and January 19, 2025, Defendants Equinix Inc., China Unicom, and National Australia Bank (NAB) knowingly and intentionally orchestrated a deceptive recruitment, synthetic identity, and cross-border trafficking scheme in violation of 18 U.S.C. §§ 1590 and 1592. The Defendants initiated this scheme through fraudulent employment advertisements posted across professional job boards, utilizing fictitious recruitment agencies, sham front-office identities, and manufactured synthetic compliance profiles that falsely represented Plaintiff Sajjad Nasir was being recruited for legitimate, long-term technical employment stationed at Defendant Equinix's physical facility located at 639 Gardeners Road, Sydney, Australia (SY1). Having successfully induced Plaintiff into accepting employment and commencing physical labor at the SY1 facility under these false pretenses—with Defendant NAB utilizing specific branch channels (Branch Code 084-435) to execute off-grid financial transfers, back-dated banking entries, and non-SWIFT tracked transactions to disguise the true source and destination of funds—Defendants executed a premeditated cross-border transfer. As part of a continuous, unified scheme to evade U.S. national security prohibitions and FCC license revocations, Defendants knowingly transported, transferred, and harbored Plaintiff from Equinix's Sydney facility to an operational facility owned, operated, and controlled by China Unicom at 2 Tai Seng Avenue, Singapore (the Tai Seng Exchange). The explicit purpose of this fraudulent recruitment, document manipulation, and international transport was to validate Equinix's SY1 facility as an operational front office, establish unrecorded physical network nodes, and manufacture artificial corporate lineage to conceal China Unicom's data routing activities.

**FACTS – ALLEGED Coercive Control, Physical Isolation, Forced Labor, and Financial Abuse**

Between January 21, 2025, and March 17, 2025, Defendants China Unicom, Equinix Inc., and NAB violated 18 U.S.C. §§ 1589 and 1592 by knowingly obtaining and maintaining Plaintiff's labor and services through a systematic scheme of physical coercion, contractual fraud, debt manipulation, and abuse of legal process. Upon Plaintiff's arrival at the Tai Seng Exchange in Singapore, Defendant China Unicom subjected

Plaintiff to extreme physical isolation and coercive transportation, forcing Plaintiff to lie face down on the covered floor of cargo vans during transit between facilities to conceal the physical location, routing hardware, and operational footprint of the enterprise under threat of immediate termination, deportation, and legal action. Under these coercive conditions, Plaintiff was compelled to perform grueling manual labor consisting of transporting, handling, rack-mounting, and staging heavy IT and telecommunications hardware directly connected to the PPC-1 subsea cable system. To enforce compliance, prevent Plaintiff from leaving, and maintain total operational control, Defendants engineered a fraudulent employment contract paired with false banking transactions administered through Defendant NAB, constructing an artificial employment debt and asserting that Plaintiff personally owed operational corporate expenses under threat of manufactured civil and criminal liabilities if he attempted to cease work. When Plaintiff suffered severe spinal trauma as a direct result of the compelled heavy manual labor, Defendants further abused legal and administrative processes by deliberately denying Plaintiff access to emergency medical evaluation and diagnostic care, systematically maintaining his physical isolation to perpetuate the forced labor scheme in violation of federal law.

.3 **FACTS – ALLEGED, COERCION, AND ABUSE OF PROCESS**

Between September 30, 2024, and March 17, 2025, Defendants Equinix Inc., National Australia Bank (NAB), and China Unicom violated 18 U.S.C. § 1589 by knowingly obtaining and maintaining Plaintiff Sajjad Nasir's forced labor and services through a scheme employing employment contractual fraud, physical isolation, coercive transportation methods, false banking transactions, abuse of legal and administrative processes, and a pattern intended to cause Plaintiff to believe he would suffer serious harm. This deceptive recruitment scheme was initiated at Defendant Equinix Inc.'s physical commercial facility located at 639 Gardeners Road, Sydney, Australia ("SY1"), where Defendants manufactured false corporate organizational identities, synthetic compliance profiles, and fraudulent personnel credentials to trap Plaintiff in cross-border transit to Singapore. To effectuate this forced labor offense, Defendants engineered a fraudulent employment contract paired with false banking transactions administered through Defendant NAB (operating through Branch Code 084-435 / Branch ID 8173 and personal account number 734158173). Defendants manipulated these records and moved off-grid cash specifically to bypass the U.S. SWIFT tracking system, constructing an artificial employment debt that forced Plaintiff to personally bear corporate, operational, and travel expenses under explicit threats of manufactured legal and financial liabilities if he attempted to cease work. Under these coercive conditions, Plaintiff was compelled into forced labor consisting of transporting, handling, rack-mounting, and staging telecommunications and IT network hardware at 2 Tai Seng Avenue (TSX Securities Exchange / Tai Seng Exchange, Singapore). The

explicit corporate objective of compelling Plaintiff's forced labor was to build, operationalize, and conceal a network of front-office facilities for Defendant China Unicom—an entity prohibited from providing telecommunications services within the United States under FCC Order 22-9 and designated on the Non-SDN Chinese Military-Industrial Complex (CMIC) List under Executive Order 13959. Crucially, the forced labor compelled by Defendants was used to physically stage, rebrand, and transfer network hardware—primarily manufactured by vendors on the FCC Covered List—into newly invented shell entities to disguise sanctioned property, bypass regulatory revocations, and maintain uninterrupted data routing through subsea cable infrastructure directly connected to U.S. jurisdiction.

.4 **FACTS – ALLEGED PHYSICAL RESTRAINT & HARM**

To enforce compliance, maintain physical isolation, and conceal the enterprise's operational footprint during the forced labor scheme, Defendant China Unicom repeatedly subjected Plaintiff to physical restraint, transporting Plaintiff face down on the covered floor of cargo vans during transit between facilities associated with China Unicom and Equinix in Singapore. As a direct result of the compelled forced labor involving heavy manual handling and rack-mounting of high-density IT and telecommunications hardware performed under these physically coercive and abusive conditions, Plaintiff sustained severe acute physical spinal trauma. Following this physical harm, Defendants further extended their systemic violations of 18 U.S.C. § 1589 by continuing to extract forced labor while abusing legal and administrative processes, deliberately denying Plaintiff access to emergency medical evaluation and diagnostic treatment to maintain his physical isolation, conceal the workplace injury, and perpetuate the forced labor cycle. Throughout this timeframe, Defendant Equinix Inc. actively facilitated this forced labor scheme and operational isolation by manipulating facility security passes and identity credentials across its owned SY1 facility in Sydney and the Tai Seng Exchange in Singapore, while Defendant NAB executed fabricated off-grid transactions to enforce the artificial debt bondage, mask the illicit financial flows sustaining the forced labor venture, and prevent Plaintiff from accessing funds to seek independent care or depart, despite Plaintiff having exhausted remedial procedures across both Australian and Singaporean jurisdictions.

**FACTS -ALLEGED** UNLAWFUL **INTERFERENCE, OBSTRUCTION, AND IDENTITY EXPLOITATION**

Between March 20, 2025, and June 6, 2025, Defendants National Australian Bank citing in active coordination to aid, abet, and protect Defendants China Unicom, Equinix Inc., and National Australia Bank (NAB)—violated 18 U.S.C. § 1589(b) by intentionally obstructing, attempting to obstruct, and interfering with the enforcement of federal forced labor prohibitions. Following a late-2024 subpoena issued to Defendant China Unicom by the U.S. House Select Committee on the Chinese Communist Party demanding

updated operational and infrastructure disclosures, Defendants exploited Plaintiff's government-issued identity documents and taxation filings to manufacture synthetic compliance profiles for China Unicom's illicit front offices. To further obstruct federal oversight and evade liability, Defendant National Australian Bank Insurance engineered a fraudulent workers' compensation insurance claim (Certificate #252790301), while coordinating with Defendant NAB to execute off-grid cash transfers and back-dated transactions bypassing the U.S. SWIFT tracking system. Operating under this fraudulent insurance claim, Defendants National Australian Bank Insurance, Dr. Diwan, and Synergy Radiology persistently solicited falsified medical reports and diagnostic test results, repeatedly delayed and canceled critical diagnostic appointments, and issued threats and harassment to undermine the documented origin of Plaintiff's forced labor injuries, conceal the enterprise's unlawful activities, and obstruct enforcement authorities.

.5 **SEVERE PHYSICAL HARM, ACUTE SPINAL TRAUMA, AND PERMANENT DISABILITY**

The forced labor scheme directly caused Plaintiff Sajjad Nasir to suffer severe, acute physical spinal trauma and permanent physical disability as a direct result of being compelled to perform heavy manual labor involving the handling, transporting, and rack-mounting of high-density IT and telecommunications hardware. This heavy manual labor was enforced under physically abusive conditions inside a repurposed facility at 2 Tai Seng Avenue (Tai Seng Exchange, Singapore) that was never structurally engineered or safely equipped to host heavy telecommunications infrastructure, but was instead improvised to hide blacklisted, sanctioned hardware for Defendant China Unicom. The physical harm was further exacerbated by Defendant China Unicom physically restraining Plaintiff during transit on the covered floor of cargo vans, and was subsequently compounded when Defendants National Australian Bank Insurance, Dr. Diwan, and Synergy Radiology deliberately blocked emergency medical evaluation, falsified diagnostic records, and denied required treatment, thereby knowingly perpetuating Plaintiff's physical suffering and permanent impairment to protect the forced labor venture.

## VII. RELIEF

**FIRST CLAIM FOR RELIEF Trafficking with Respect to Forced Labor 18 U.S.C. 1590**
(*Against Defendants Equinix Inc., China Unicom)*

1. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.
2. Defendants Equinix Inc., China Unicom, and National Australia Bank (NAB), individually and in conspiracy with one another, knowingly recruited, enticed, harbored, transported, provided, and obtained Plaintiff Sajjad Nasir for labor and services in violation of Chapter 77 of Title 18 of the United States Code, specifically 18 U.S.C. §§ 1589 and 1590.
3. **Fraudulent Recruitment and Enticement (18 U.S.C. § 1590):** Defendants initiated this unlawful scheme by knowingly and deceitfully enticing and recruiting Plaintiff in Sydney, Australia. Defendants utilized fraudulent job advertisements, fictitious recruitment agencies, sham front-office identities, and synthetic compliance profiles to falsely represent that Plaintiff was being hired for legitimate, long-term technical employment stationed at Defendant Equinix's physical facility located at 639 Gardeners Road, Sydney, Australia (SY1).
4. **Cross-Border Transportation (18 U.S.C. § 1590):** Having successfully induced Plaintiff into accepting employment and commencing labor under false pretenses, Defendants executed a premeditated cross-border transfer, knowingly transporting Plaintiff from Equinix's Sydney facility to an operational facility owned, operated, and controlled by Defendant China Unicom at 2 Tai Seng Avenue, Singapore (the Tai Seng Exchange). Defendants executed this international transport as part of a unified scheme to validate front-office operations, establish unrecorded network nodes, and subvert U.S. national security prohibitions and FCC license revocations.
5. **Harbouring, Obtaining, and Underlying Forced Labor (18 U.S.C. §§ 1589, 1590):** Upon Plaintiff's arrival in Singapore, Defendants knowingly harbored, contained, and obtained Plaintiff's labor and services under forced labor conditions in violation of 18 U.S.C. § 1589. Defendants compelled Plaintiff to perform heavy manual labor—consisting of transporting, handling, rack-mounting, and staging IT and

telecommunications hardware connected to the PPC-1 subsea cable system—through a combination of coercive methods:

6. **Physical Coercion and Restraint:** Subjecting Plaintiff to physical isolation and coercive transit conditions, forcing Plaintiff to lie face down on the covered floor of cargo vans during movement between facilities to conceal operational footprints;
7. **Abuse and Threatened Abuse of Legal Process:** Threatening Plaintiff with immediate employment termination, summary deportation, and manufactured civil and criminal liabilities if he attempted to cease work;
8. **Debt Bondage and Financial Manipulation:** Constructing an artificial employment debt through a fraudulent contract paired with off-grid financial transfers, back-dated banking entries, and non-SWIFT transactions executed through Defendant NAB (Branch Code 084-435) to assert that Plaintiff owed operational corporate expenses; and
9. **Infliction of Serious Harm and Medical Denial:** Intentionally denying Plaintiff access to emergency medical evaluation, diagnostic care, and treatment after Plaintiff suffered severe spinal trauma as a direct result of compelled manual labor, systematically maintaining his physical containment to perpetuate the scheme.
10. **Scienter:** Defendants committed each of the aforementioned acts knowingly, intentionally, and with premeditated knowledge that Plaintiff was recruited, transported, harbored, and obtained through fraud, coercion, physical restraint, and abuse of legal process for the purpose of forced labor.
11. **Conspiracy and Joint Liability (18 U.S.C. § 1594):** Defendants Equinix Inc., China Unicom, and NAB conspired, combined, and acted in concert to violate 18 U.S.C. §§ 1589 and 1590, rendering each Defendant jointly and severally liable for all underlying statutory violations pursuant to 18 U.S.C. § 1594.

12. **Extraterritorial Jurisdiction (18 U.S.C. § 1596):** Pursuant to 18 U.S.C. § 1596, this Court possesses statutory extraterritorial jurisdiction over Defendants' violations of 18 U.S.C. §§ 1589 and 1590, as Defendants maintain continuous commercial and operational presences within the United States, and the trafficking scheme was executed to subvert federal regulatory bans and manage physical infrastructure connected to U.S. telecommunications networks.

13. **Civil Cause of Action (18 U.S.C. § 1595):** Plaintiff is expressly authorized to bring this civil action and seek full financial recovery against Defendants pursuant to 18 U.S.C. § 1595.
14. **Proximate Cause and Damages:** As a direct and proximate result of Defendants' intentional, willful, and unlawful trafficking and forced labor practices, Plaintiff has sustained severe physical injuries, acute spinal trauma, permanent physical disability, prolonged emotional distress, mental anguish, loss of earning capacity, and substantial economic losses.
15. **Prayer for Relief:** Plaintiff is therefore entitled to recover compensatory damages, statutory damages, punitive damages, reasonable attorneys' fees, litigation costs, and such other legal and equitable relief as the Court deems just and proper pursuant to 18 U.S.C. § 1595.

**SECOND CLAIM FOR RELIEF (Forced Labor in Violation of 18 U.S.C. § 1589)**

*(Against Defendants Equinix Inc. and China Unicom)*

1. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.
2. Defendants Equinix Inc. and China Unicom, individually, in concert, and in conspiracy with one another, knowingly obtained and maintained Plaintiff Sajjad Nasir's labor and services in violation of 18 U.S.C. § 1589 by means of physical restraint, schemes intended to cause fear of serious harm, abuse and threatened abuse of legal and administrative processes, and artificial debt bondage.
3. **Compelled Manual Labor and Physical Restraint (18 U.S.C. § 1589(a)(1)):** Defendants knowingly obtained Plaintiff's forced labor by subjecting Plaintiff to severe physical restraint and abusive transit conditions, forcing Plaintiff to lie face down on the covered floor of cargo vans during transit between facilities in Singapore. Under these physically restrictive conditions, Defendants compelled Plaintiff to perform grueling manual labor—specifically transporting, handling, rack-mounting, and staging high-density IT and telecommunications hardware at an improvised facility located at 2 Tai Seng Avenue (Tai Seng Exchange, Singapore), directly causing Plaintiff severe acute physical spinal trauma and permanent physical disability.
4. **Coercive Scheme, Plan, or Pattern (18 U.S.C. § 1589(a)(2)):** Defendants knowingly devised and executed a coordinated scheme and pattern of coercion starting at Defendant Equinix Inc.'s commercial facility located at 639 Gardeners Road, Sydney, Australia (SY1). Defendants manufactured false corporate identities, synthetic compliance profiles, and fraudulent personnel credentials to trap Plaintiff in cross-border transit to Singapore, establishing a controlled environment intended to cause Plaintiff to reasonably believe that failure to perform compelled labor would result in serious physical, financial, and reputational harm.
5. **Abuse and Threatened Abuse of Legal and Administrative Processes (18 U.S.C. § 1589(a)(3)):** Defendants knowingly maintained Plaintiff's labor through the systematic abuse of legal and administrative procedures. Defendants repeatedly threatened Plaintiff with immediate employment termination, summary deportation, and manufactured civil

and criminal liabilities if he attempted to cease work. Furthermore, following Plaintiff's acute spinal trauma, Defendants abused administrative processes by deliberately blocking emergency medical evaluation and diagnostic treatment, systematically maintaining Plaintiff's physical containment to conceal workplace injuries and perpetuate the forced labor cycle.

6. **Debt Bondage and Financial Coercion (18 U.S.C. § 1589(a)(4)):** Defendants engineered a fraudulent employment contract paired with manipulated banking records and off-grid financial transfers structured to bypass U.S. SWIFT tracking. Defendants utilized these false records to construct an artificial employment debt, forcing Plaintiff to personally bear corporate, operational, and international travel expenses under explicit threats of financial ruination and legal action if he attempted to depart.
7. **Venture Participation and Active Obstruction (18 U.S.C. § 1589(b)):** Defendants Equinix Inc. and China Unicom knowingly participated in, benefitted from, and received commercial value from a forced labor venture aimed at staging, rebranding, and routing blacklisted telecommunications hardware through subsea cable infrastructure connected to U.S. jurisdiction. Defendant Equinix Inc. actively facilitated this forced labor venture by manipulating facility security passes and identity credentials across its Sydney SY1 facility and the Tai Seng Exchange in Singapore. Furthermore, Defendants actively obstructed federal forced labor prohibitions and legislative oversight by exploiting Plaintiff's identity documents and tax filings to manufacture synthetic compliance profiles to subvert Congressional inquiry.
8. **Scienter:** Defendants committed each of the aforementioned acts knowingly, intentionally, and with premeditated knowledge, or in reckless disregard of the fact, that Plaintiff's labor and services were obtained and maintained through force, physical restraint, coercion, debt manipulation, and abuse of legal process.
9. **Conspiracy and Joint Liability (18 U.S.C. § 1594):** Defendants Equinix Inc. and China Unicom conspired, combined, and acted in concert to violate 18 U.S.C. § 1589, rendering each Defendant jointly and severally liable for all underlying statutory violations pursuant to 18 U.S.C. § 1594.
10. **Extraterritorial Jurisdiction (18 U.S.C. § 1596):** Pursuant to 18 U.S.C. § 1596, this Court possesses statutory extraterritorial jurisdiction over Defendants' violations of 18

U.S.C. § 1589, as Defendants maintain continuous commercial and operational presences within the United States, and the forced labor venture was conducted to subvert federal regulatory revocations and manage subsea telecommunications infrastructure connected to the United States.

11. **Civil Cause of Action (18 U.S.C. § 1595):** Plaintiff is expressly authorized to bring this civil cause of action and seek full financial recovery against Defendants pursuant to 18 U.S.C. § 1595.

12. **Proximate Cause and Damages:** As a direct and proximate result of Defendants' intentional, willful, and unlawful forced labor practices, Plaintiff has sustained severe physical injuries, acute spinal trauma, permanent physical disability, prolonged emotional distress, mental anguish, loss of earning capacity, and substantial economic losses.

**13. PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Sajjad Nasir respectfully requests that this Honorable Court enter judgment against Defendants Equinix Inc. and China Unicom, jointly and severally, and grant the following relief:

A. **Compensatory Damages:** Award Plaintiff compensatory damages in an amount to be proven at trial pursuant to 18 U.S.C. § 1595, including but not limited to damages for physical injuries, acute spinal trauma, permanent physical impairment, past and future medical expenses, physical pain and suffering, severe emotional distress, mental anguish, and loss of earning capacity;

B. **Restitution and Financial Disgorgement:** Award Plaintiff full restitution for the value of all labor and services exacted by Defendants under 18 U.S.C. § 1595, alongside the disgorgement and cancellation of all artificial debts, corporate expenses, and fraudulent financial obligations imposed on Plaintiff;

C. **Punitive and Exemplary Damages:** Award Plaintiff punitive and exemplary damages in an amount sufficient to punish Defendants for their willful, egregious, and intentional violations

of federal human trafficking and forced labor laws, and to deter such unlawful conduct in the future;

D. **Statutory Pre-Judgment and Post-Judgment Interest:** Award Plaintiff pre-judgment and post-judgment interest on all monetary awards as allowed by law;

E. **Attorneys' Fees and Costs:** Award Plaintiff reasonable attorneys' fees, expert witness fees, and all litigation costs incurred in bringing this action pursuant to 18 U.S.C. § 1595; and

F. **Other Just and Proper Relief:** Grant such other and further legal, equitable, or injunctive relief as this Court deems necessary, just, and proper.

**THIRD CLAIM FOR RELIEF -Obstructing and Interfering with the Enforcement of Trafficking Prohibitions 18 U.S.C. § 1590(b) and 18 U.S.C. § 1595**

*(Against Defendant National Australia Bank)*

1. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.
2. Pursuant to 18 U.S.C. § 1590(b), whoever knowingly obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of 18 U.S.C. § 1590 shall be subject to the full statutory penalties and civil liabilities provided under federal law.
3. **Off-Grid Financial Structuring and SWIFT Tracking Evasion (18 U.S.C. § 1590(b)):** Defendant National Australia Bank (NAB) knowingly, intentionally, and willfully interfered with and obstructed the enforcement of federal human trafficking laws by executing, manipulating, and masking illicit financial flows that sustained the trafficking scheme. Operating through specific branch channels (Branch Code 084-435 / Branch ID 8173 and personal account number 734158173), Defendant NAB deliberately engineered back-dated banking entries, off-grid cash transfers, and non-SWIFT tracked transactions specifically designed to bypass U.S. banking scrutiny and evade SWIFT data tracking mechanisms.
4. **Interference with Federal Enforcement and Regulatory Oversight (18 U.S.C. § 1590(b)):** Defendant NAB actively interfered with and prevented regulatory and statutory enforcement against principal Defendants Equinix Inc. and China Unicom. By fabricating financial transactions and manipulating Plaintiff's financial information and account data, Defendant NAB obscured the illicit enterprise's financial footprint. This financial concealment directly frustrated and hindered federal oversight authorities—including enforcement under FCC Order 22-9, OFAC Non-SDN Chinese Military-Industrial Complex List sanctions under Executive Order 13959, and legislative subpoenas issued by the U.S. House Select Committee on the Chinese Communist Party.
5. **Financial Coercion and Debt Enforcement in Aid of Obstruction:** Defendant NAB further obstructed anti-trafficking enforcement by constructing and enforcing artificial employment debts against Plaintiff Sajjad Nasir. NAB executed false banking transactions that saddled Plaintiff with operational, corporate, and travel expenses, creating a coercive financial obligation under threat of manufactured legal liability. This financial manipulation deprived Plaintiff of the economic resources required to depart, seek independent medical evaluation, or report the ongoing trafficking violations to law enforcement authorities.
6. **Scienter:** Defendant NAB committed each of the aforementioned acts knowingly, intentionally, and with willful disregard of federal trafficking prohibitions, possessing actual knowledge or acting

in reckless disregard of the fact that its financial manipulations obstructed enforcement and directly aided an active human trafficking venture.

7. **Extraterritorial and Supplemental Jurisdiction (18 U.S.C. § 1596 & 28 U.S.C. § 1367):** Subject to Rule 18 and Rule 20, this Court possesses subject matter and supplemental jurisdiction over Defendant NAB pursuant to 28 U.S.C. § 1367 and 18 U.S.C. § 1595, as the claims against NAB arise from the same common nucleus of operative facts as those asserted against principal Defendants Equinix Inc. and China Unicom. Furthermore, extraterritorial jurisdiction exists pursuant to 18 U.S.C. § 1596, as Defendant NAB maintains continuous commercial presences within the United States, including SEC registration and securities trading, and executed off-grid financial manipulations specifically to evade U.S. regulatory oversight and SWIFT tracking systems.

8. **Civil Cause of Action (18 U.S.C. § 1595):** Plaintiff is expressly authorized to bring a civil action against Defendant NAB under 18 U.S.C. § 1595(a) to recover full financial damages caused by NAB's violations of 18 U.S.C. § 1590(b).

9. **Proximate Cause and Damages:** As a direct and proximate result of Defendant NAB's intentional obstruction, interference, and financial manipulation under 18 U.S.C. § 1590(b), Plaintiff's physical containment and forced labor conditions were prolonged, directly contributing to severe physical injuries, acute spinal trauma, permanent physical disability, financial ruination, severe emotional distress, and substantial economic losses.

10. **PRAYER FOR RELIEF (AGAINST DEFENDANT NATIONAL AUSTRALIA BANK)**

**WHEREFORE**, Plaintiff Sajjad Nasir respectfully requests that this Honorable Court enter judgment against Defendant National Australia Bank (NAB) under 18 U.S.C. § 1590(b) and 18 U.S.C. § 1595, and grant the following relief:

A. **Compensatory Damages:** Award Plaintiff compensatory damages against Defendant NAB, jointly and severally with co-Defendants where applicable, in an amount to be proven at trial pursuant to 18 U.S.C. § 1595, for physical, financial, and emotional injuries proximately caused by NAB's unlawful obstruction and interference;

B. **Disgorgement and Debt Cancellation:** Order Defendant NAB to disgorge all financial proceeds, transaction fees, and commercial benefits derived from its off-grid transactions supporting the enterprise, and enter an order declaring all artificial debts, corporate expenses, and financial obligations asserted against Plaintiff to be null, void, and unenforceable;

C. **Punitive and Exemplary Damages:** Award Plaintiff punitive and exemplary damages against Defendant NAB in an amount sufficient to punish its willful evasion of U.S. banking scrutiny and

deliberate obstruction of anti-trafficking enforcement, and to deter future institutional banking interference;

D. **Statutory Pre-Judgment and Post-Judgment Interest:** Award Plaintiff pre-judgment and post-judgment interest on all monetary awards as permitted by law;

E. **Attorneys' Fees and Costs:** Award Plaintiff reasonable attorneys' fees, expert witness costs, and all litigation expenses incurred pursuant to 18 U.S.C. § 1595(a); and

F. **Other Just and Proper Relief:** Grant such other and further legal, equitable, or declaratory relief as this Court deems necessary, just, and proper.

## VIII. CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11. I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 07/24/2026

Signature of Plaintiff

Printed Name of Plaintiff Sajjad Nasir

**INDEX OF EXHIBITS**

| Exhibit No. | Document | Description |
|---|---|---|
| **Exhibit 1** | FCC FOIA Request (FCC-FOIA-2026-000770) | FOIA request filed with the Federal Communications Commission seeking records of foreign landing locations, CLS licensing history, and capacity holder filings for Chinese submarine cable operators, including China Unicom |
| **Exhibit 2** | FCC Acknowledgement Letter (07/21/2026) | Official acknowledgement from the FCC FOIA Office confirming receipt of FOIA Request FCC-FOIA-2026-000770 and assigning control number |
| **Exhibit 3** | FCC Section 43.82 Circuit Capacity Data Report (2023) – Table 1 | Official FCC report listing **China United Network Communications Group Company Limited (China Unicom)** as a Submarine Cable Capacity Holder on U.S.-international submarine cables |
| **Exhibit 4** | FCC Section 43.82 Circuit Capacity Data Report (2023) – Appendix B (Definitions) | FCC definitions establishing that "United States" includes Guam and other territories, and that "Capacity Holders" are subject to FCC jurisdiction |
| **Exhibit 5** | FCC Section 43.82 Circuit Capacity Data Report (2023) – Attachment A | FCC report showing PPC-1 cable landing points, confirming the cable connects to Guam (U.S. territory) |
| **Exhibit 6** | China Unicom Global Network Map | China Unicom's own published map showing its Global Point of Presence (PoP) at **2 Tai Seng Avenue, Singapore** and its submarine cable network connecting to FCC-licensed cables |
| **Exhibit 7** | Equinix Data Center Specifications – SG4 (2 Tai Seng Avenue, Singapore) | Equinix's own published specifications confirming its data center operations at 2 Tai Seng Avenue, Singapore |

Federal Communications Commission
Washington, D.C. 20554

**07/21/2026**

Acknowledgement of FOIA Request

Dear **Sajjad**,

This acknowledges receipt of your Freedom of Information Act (FOIA) request filed with the Federal Communications Commission (FCC). Your request has been assigned FOIA Control Number **FCC-FOIA-2026-000770**. Agencies are allowed 20 working days to respond to your request, extending this period for an additional 10 working days under certain circumstances. See 5 U.S.C. § 552(a)(6)(A)(i) and 5 U.S.C. § 552(a)(6)(B)(i). If additional time is needed to respond to your request, you will be notified.

If you have any questions concerning this notice, please email at FOIA-Public-Liaison@fcc.gov.

FCC FOIA Office

NewRequest FCC-FOIA-2026-000770

You have received document(s) for Request:
FCC-FOIA-2026-000770

# "FOIA REQUEST ? FCC (Section 43.62 Submarine Cable"

Documents are attached to this email.

## Request Details

| | |
|---|---|
| **Title** | FCC-FOIA-2026-000770 - **FOIA REQUEST ? FCC (Section 43.62 Submarine Cable Filings & CLS Licensing Records)** **Title** Request for Foreign Landing Locations and CLS License History for Chinese Cable Operators/Capacity Holders **Description** This FOIA request concerns records held by the FCC International Bureau relating to **Section 43.62 Submarine Cable Operator and Capacity Holder filings**, and **Cable Landing Station (CLS) licensing/authorization records**. I request the FCC to provide **existing records** identifying: **1. All foreign landing?point countries** associated with **Chinese submarine cable operators or capacity holders**, excluding: - United States - China - Hong Kong **2. The earliest year (?first granted year?)** in which each CLS license or landing authorization was issued for those foreign landing points. **3. Any subsequent changes** to those CLS licenses or landing authorizations, including: - additions of landing points - reductions - cancellations - revocations - modifications - renewals - transfers of control - amendments This request applies to all Chinese entities appearing in FCC Section 43.62 filings, including but not limited to: - **China Telecom (Americas) Corporation** - **China Telecommunications Corporation** - **China United Network Communications Group Company Limited (China Unicom)** - **China Mobile International** - **Any other PRC?controlled operator or capacity holder listed in FCC filings** **Tables Provided for Clarity** To avoid ambiguity, I am attaching the relevant FCC tables exactly as published in the report titled: **?2016 Circuit Capacity Data for U.S.-International Submarine Cables?** Specifically: - **Table 1** ? Section 43.62 Circuit Capacity Filers - **Table 5** ? Submarine Cable Capacity Holder Reports - **Attachment A** ? Landing Points by Cable - |

**Attachment B** ? Landing Points by Country - **Attachment C** ? Landing Points by Frequency Please complete these tables by adding the following columns: 1. **? Foreign Landing Point Country (excluding USA, China, Hong Kong)?** 2. **?Year First Granted (CLS License or Landing Authorization)?** 3. **?Subsequent Changes (Additions, Reductions, Cancellations, Modifications)?** **Records Requested** This request seeks **existing FCC records only**, including: - CLS license grant dates - CLS license modification/cancellation records - Landing authorization records - Section 43.62 filings identifying foreign landing points - International Bureau cable landing station construction permits - Any amendments, renewals, or revocations related to foreign landing points No analysis or creation of new records is requested. --- **Date Range for Record Search** From: **Earliest year available in FCC records** To: **Most recent year available (e.g., 2024 or later)** (This ensures FCC provides the true ?first granted year,? without assuming a starting date.) --- **Fee Waiver Request Reason** I request a fee waiver because the disclosure of this information is **in the public interest**. The requested records concern: - international telecommunications infrastructure, - foreign landing?point jurisdictions, - CLS licensing history, - and operator nationality classifications. These are matters of **public regulatory significance**, not commercial interest. I am not seeking the information for commercial use, and the disclosure will contribute to public understanding of FCC?regulated international cable systems and foreign landing authorizations. --- **Amount Willing to Pay** If the fee waiver is denied, I am willing to pay up to: **$25**

| | | | |
|---|---|---|---|
| **Type** | New Request | **Queue** | Intake |
| **Created** | 07/21/2026 19:48 PM America/New_York | **Received** | 07/21/2026 19:48 PM America/New_York |
| **Assignee** | | **Owning Group** | OFFICERS@FCC.GOV |
| **Due** | 08/19/2026 17:00 PM America/New_York | **Priority** | Medium |
| **Modified** | 07/21/2026 19:48 PM America/New_York | **Modified By** | |

This is an automated email notification sent from ArkCase.

## 2023 Circuit Capacity Data For U.S.-International Submarine Cables

**Table 1** **Section 43.82 Circuit Capacity Filers (2023)** – Entities that filed a cable operator and/or capacity holder report.

**Table 2** **Number of Reports Filed By Submarine Cable Operators (2023)**

**Table 3** **Submarine Cable Operator Reports (in Gbps) (2023/2025)** – Available and planned capacity for each U.S.-international submarine cable, with regional totals.

**Table 4** **Submarine Cable Operator Capacity Trend Data (in Gbps)** – Detailed capacity trend data for each U.S.-international submarine cable.

**Table 5** **Submarine Cable Capacity Holder Reports by Region (2023)** – Capacity holder data (i.e., cable capacity leased or owned by all filing entities) on a regional basis.

**Table 6** **Comparison of Capacities Reported from Cable Operator Reports and Capacity Holder Reports (2023)** – Comparison of total available capacity reported in the cable operator reports with total owned capacity in the capacity holder reports, on a regional basis.

**Attachment A** U.S.-International Submarine Cables – Landing Points by Region, Cable, and Foreign Landing Point as of December 31, 2023

**Attachment B** U.S.-International Submarine Cables – Landing Points by Region, Foreign Landing Point, and Cable as of December 31, 2023

**Attachment C** U.S.-International Submarine Cables – Landing Points by Number of Landing Points Per Country and Region and a Frequency Table Summarizing Foreign Landing Points Per Country as of December 31, 2023

**Source:** Office of International Affairs, Federal Communications Commission

For definitions of terms and instructions on filing procedures, please refer to the Filing Manual (Feb. 2020)

For further information on current and past reports, see https://www.fcc.gov/circuit-capacity-data-us-international-submarine-cables

**Table 1**
**Section 43.82 Circuit Capacity Filers (2023)**

| No. | Entities | Submarine Cable Operator Reports | Submarine Cable Capacity Holder Reports |
|---|---|---|---|
| 1 | AARNet Pty Ltd | | ✓ |
| 2 | ALGAR TELECOM S/A | | ✓ |
| 3 | AMCS LLC | | ✓ |
| 4 | American Samoa Hawaii Cable, LLC | ✓ | ✓ |
| 5 | American Samoa Telecommunications Authority | | ✓ |
| 6 | ANGOLA CABLES | | ✓ |
| 7 | Antel | | ✓ |
| 8 | Antelecom N.V. | | ✓ |
| 9 | Antilles Crossing-St. Croix, Inc. | ✓ | ✓ |
| 10 | Aqua Comms (Americas) Inc | ✓ | ✓ |
| 11 | ARCOS-1 USA, Inc. | ✓ | ✓ |
| 12 | Arelion U.S. Inc. | | ✓ |
| 13 | AT&T Corp. | ✓ | ✓ |
| 14 | Atlantic Teleconnection Operating Company Limited | | ✓ |
| 15 | Australia-Japan Cable (Guam) Limited | ✓ | ✓ |
| 16 | Bharti Airtel (USA) Ltd. | | ✓ |
| 17 | Bharti Airtel Limited | | ✓ |
| 18 | BT Americas Inc. | | ✓ |
| 19 | Cable and Wireless (BVI) Limited | | ✓ |
| 20 | Cable and Wireless Americas Systems Inc. | ✓ | ✓ |
| 21 | Cable Andino, Inc. | | ✓ |
| 22 | Caribbean Crossings Ltd. | ✓ | ✓ |
| 23 | Cedar Cable Ltd. | ✓ | ✓ |
| 24 | CenturyLink Communications, LLC | | ✓ |
| 25 | China Mobile International Limited | | ✓ |
| 26 | China Telecom Global Limited | | ✓ |
| 27 | China Telecommunications Corporation | | ✓ |
| 28 | China United Network Communications Group Company Limited | | ✓ |
| 29 | Chunghwa Telecom Co., Ltd. | | ✓ |
| 30 | Cirion Technologies Solutions, LLC | ✓ | ✓ |
| 31 | City of Ketchikan | ✓ | ✓ |
| 32 | Claro S.A. (Embratel) | | ✓ |
| 33 | COGENT COMMUNICATIONS HOLDINGS INC | ✓ | ✓ |
| 34 | COLT Telecommunications | ✓ | ✓ |
| 35 | Columbus Networks USA, Inc. | ✓ | ✓ |
| 36 | Crosslake Fiber USA LP | ✓ | ✓ |
| 37 | Crown Castle Fiber LLC | | ✓ |
| 38 | CWC New Cayman Limited | ✓ | ✓ |
| 39 | Deutsche Telekom North America, Inc. | | ✓ |

| No. | Entities | Submarine Cable Operator Reports | Submarine Cable Capacity Holder Reports |
|---|---|---|---|
| 40 | DOCOMO PACIFIC, INC. | | ✓ |
| 41 | Edge Cable Holdings USA, LLC | ✓ | ✓ |
| 42 | EXA Infrastructure US LLC | ✓ | ✓ |
| 43 | FLAG Telecom Limited | ✓ | ✓ |
| 44 | France Telecom Long Distance USA, LLC d/b/a Orange Carriers USA | | ✓ |
| 45 | Global Caribbean Network | ✓ | ✓ |
| 46 | Global Transit 2 Limited | | ✓ |
| 47 | Global Transit Limited | | ✓ |
| 48 | GlobeNet Cabos Submarinos America, Inc. | ✓ | ✓ |
| 49 | GTI Corporation | | ✓ |
| 50 | GU Holdings Inc. | ✓ | ✓ |
| 51 | Hannon Armstrong KCS Funding, LLC | | ✓ |
| 52 | Hawaiian Telcom Services Company, Inc. | ✓ | |
| 53 | Hawaiki Submarine Cable USA LLC | ✓ | ✓ |
| 54 | HUB Advanced Networks, LLC | | ✓ |
| 55 | KDDI America, Inc. | | ✓ |
| 56 | KT Corporation | | ✓ |
| 57 | Latam Telecommunications, L.L.C. | ✓ | ✓ |
| 58 | Ledcor Industries (USA) Inc. | ✓ | |
| 59 | Level 3 Communications, LLC | | ✓ |
| 60 | Marine Cable Corporation | | ✓ |
| 61 | Megaport (USA), Inc. | | ✓ |
| 62 | Microsoft Infrastructure Group, LLC | | ✓ |
| 63 | Microsoft Operations Pte Ltd | ✓ | ✓ |
| 64 | National Telecom Public Company Limited | | ✓ |
| 65 | Network i2i Limited | | ✓ |
| 66 | Neutral Networks USA LLC | ✓ | ✓ |
| 67 | NTT America, Inc. | | ✓ |
| 68 | NTT Ltd Japan Corporation | ✓ | ✓ |
| 69 | ONATI Honotua Division (U.S.) | ✓ | ✓ |
| 70 | Optibulk Havfrue AS | | ✓ |
| 71 | Orange Business Services U.S., Inc. | | ✓ |
| 72 | Pacific Carriage Limited Inc. | ✓ | ✓ |
| 73 | PC Landing Corp. | ✓ | ✓ |
| 74 | PCCW Global, Inc. | | ✓ |
| 75 | PLDT Inc. | | ✓ |
| 76 | PPC 1 Limited | ✓ | ✓ |
| 77 | PT Telekomunikasi Indonesia International | | ✓ |
| 78 | PTI Pacifica Inc. | | ✓ |
| 79 | Puerto Rico Telephone Company, Inc. | | ✓ |
| 80 | Reach Services USA | | ✓ |
| 81 | Rogers Telecom (US) Inc. | | ✓ |

Control Number 3060-1156

# FILING MANUAL FOR SECTION 43.82 CIRCUIT CAPACITY REPORTS

**International Bureau**
**February 2020**

## TABLE OF CONTENTS

Heading Paragraph #

I. FILING REQUIREMENTS ....1
- A. Who Must File a Circuit Capacity Report? ....3
- B. Filing Requirements for Merged Entities ....4
- C. Affiliated Corporations Must File by Legal Entity ....5
- D. Filing Date – Due by March 31 of Each Year ....9
- E. Compliance ....10
- F. Revisions ....12
- G. Reporting Period ....13
- H. Rounding of Numbers and Negative Numbers ....14
- I. Estimation ....16
- J. Record Keeping ....17
- K. Filing Format ....18
- L. The Registration Form ....19
  1. Basic Information about the Filing and Filing Entity ....20
  2. Certification of Accuracy and Completeness of Reports ....21
  3. Confidential Treatment of Filed Information ....25

II. ANNUAL CIRCUIT CAPACITY REPORT ....27
- A. Cable Operator Report ....28
- B. Capacity Holder Report ....32
- C. Circuit Capacity Reporting Examples

APPENDIX A: Section 43.82 Rules
APPENDIX B: Definitions
APPENDIX C: Sample Registration Form
APPENDIX D: Sample Circuit Capacity Report

# APPENDIX A: Section 43.82 Rules

**§ 43.82 Circuit Capacity Reports.**

(a) *International Submarine Cable Capacity.* Not later than March 31 of each year:

(1) The licensee(s) of a submarine cable between the United States and any foreign point shall file a report showing the capacity of the submarine cable as of December 31 of the preceding calendar year. The licensee(s) shall also file a report showing the planned capacity of the submarine cable (the intended capacity of the submarine cable two years from December 31 of the preceding calendar year).

(2) Each cable landing licensee and common carrier shall file a report showing its capacity on submarine cables between the United States and any foreign point as of December 31 of the preceding calendar year.

Note to Paragraph (a): United States is defined in Section 3 of the Communications Act of 1934, as amended, 47 U.S.C. 153.

(b) A Registration Form, containing information about the filer, such as address, phone number, email address, etc., shall be filed with each report. The Registration Form shall include a certification enabling the filer to check a box to indicate that the filer requests that its circuit capacity data be treated as confidential consistent with Section 0.459(a)(4) of the Commission's rules.

(c) Filing Manual. Authority is delegated to the Chief of the International Bureau to prepare instructions and reporting requirements for the filing of these reports prepared and published as a Filing Manual. The information required under this Section shall be filed electronically in conformance with the instructions and reporting requirements in the Filing Manual.

## APPENDIX B: Definitions

**Capacity Holder** refers to a cable landing licensee or common carrier that holds capacity on the U.S. end of an international submarine cable as of December 31 of the reporting period. A holding of capacity is an interest in the U.S. end of an international submarine cable through cable ownership, an indefeasible right of use (IRU), or an inter-carrier lease (ICL).

**Circuit** refers to a path for electromagnetic transmission of information between two or more points, including transmission by submarine or terrestrial cable, satellite, wire, or radio. In addition to a dedicated channel, a service guarantee for electromagnetic transmission of information between two or more points at an agreed-upon data speed is considered a circuit for reporting International Private Line Service under section 43.82 of the Commission's rules.

**Common Carrier** refers to a person or entity in the United States that provides telecommunications services (i.e., telecommunications on a common carrier basis) in the United States or between the United States and a foreign point or holds a U.S. section 214 license to do so. A U.S. Common Carrier does not refer to the nationality of the employees or owners of a communications entity. An affiliate of a U.S. Common Carrier that operates in a foreign point as a common carrier is a Foreign Carrier.

**Filing Entity** refers to a person or entity that is required to file information with the FCC pursuant to section 43.82 of the Commission's rules.

**Foreign Point** refers to a foreign country or other geographic location outside the United States.

**Indefeasible Right of Use (IRU)** refers to an arrangement in which the holder has made an upfront payment for the full length of the lease, such as 5, 10, 20 years, or the remaining useful life of the asset.

**Inter-Carrier Lease** (**ICL**), for section 43.82 reporting purposes, refers to a lease of bare capacity between one entity and another.

**United States** refers to the several States and Territories, the District of Columbia, and the possessions of the United States, but does not include the Canal Zone. 47 U.S.C. § 153.


UniCom
Network Capabilities
All Resources
All Districts
Search
Landing Station
Sydney, Australia
China Unicom Global Resources
Cloudbond
Data Center
Smart Video Network Node
China Unicom Global Cables
PIPE Pacific Cable-1 (PPC-1)
Cables
Coral Sea Cable System (CS²)
East Coast Cable System
Gondwana-1
Hawaiki
Hawaiki Nui
Sydney-Melbourne-Adelaide-Perth (SMAP)
Sydney, Australia
South Pacific Ocean
Indian Ocean
North Pacific Ocean

UniCom

Network Capabilities

All Resources | All Districts | Search




Landing Station

## Singapore, Singapore

### China Unicom Global Resources

- Cloudbond
- Data Center
- Smart Video Network Node

### China Unicom Global PoPs

- Singapore I (Equinix)
  Equinix Singapore,20 Ayer Rajah Crescent，#05-05/08,Singapore 139964
- Singapore II (GlobalSwitch)
  2 Tai Seng Avenue, Singapore 534408
- Singapore 1 Net North
  18 Riverside Road, 739088， LEVEL 5,机房编号502
- Singapore SGX
  25 Serangoon North Ave 5 Singapore 554914,Level 4
- Singapore Keppel
  Keppel KDCSGP5 POP:13 Sunview Way, Singapore 627541

### China Unicom Global Cables

i2i Cable Network (i2icn)
Asia Pacific Gateway (APG)
Asia Submarine-cable Express (ASE)/Cahaya Malaysia
EAC-C2C
Asia Africa Europe-1 (AAE-1)
Asia-America Gateway (AAG) Cable System
JAKABARE
Tata TGN-Intra Asia (TGN-IA)

## INDEX OF EXHIBITS B

| Exhibit | Description | Purpose |
|---|---|---|
| **A** | Photographs, maps, and address records of 2 Tai Seng Avenue, Singapore | Confirms the physical location of the data center where Plaintiff was trafficked and forced to perform manual labor |
| **B** | Documents showing China Unicom's operational presence at 2 Tai Seng Avenue, Singapore | Establishes China Unicom's ownership or association with the facility |
| **C** | Documents showing the interconnected network at 2 Tai Seng Avenue, including Equinix and SoftBank (BBIX) | Demonstrates the coordinated infrastructure used to evade U.S. sanctions |
| **D** | Documents showing Equinix's ownership of 639 Gardeners Road, Sydney, Australia | Establishes the originating location of the trafficking scheme |
| **E** | FCC Order 22-9 and Commissioner Starks' statement | Proves the FCC revoked China Unicom's telecom license but admitted it lacked jurisdiction over data centers |
| **F** | Congressional letter dated March 3, 2025 | Demonstrates the coordinated political and regulatory smokescreen |
| **G** | OFAC NS-CMIC List designation for China Unicom | Establishes that the property is subject to U.S. sanctions jurisdiction |

OFAC
Office of Foreign Assets Control

# Sanctions List Search

Specially Designated Nationals and Blocked Persons list ("SDN List") and all other sanctions lists administered by OFAC, including the Foreign Sanctions Evaders List, the Non-SDN Iran Sanctions Act List, the Sectoral Sanctions Identifications List, the List of Foreign Financial Institutions Subject to Correspondent Account or Payable-Through Account Sanctions and the Non-SDN Palestinian Legislative Council List. Given the number of lists that now reside in the Sanctions List Search tool, it is strongly recommended that users pay close attention to the program codes associated with each returned record. These program codes indicate how a true hit on a returned value should be treated. The Sanctions List Search tool uses approximate string matching to identify possible matches between word or character strings as entered into Sanctions List Search, and any name or name component as it appears on the SDN List and/or the various other sanctions lists. Sanctions List Search has a slider-bar that may be used to set a threshold (i.e., a confidence rating) for the closeness of any potential match returned as a result of a user's search. Sanctions List Search will detect certain misspellings or other incorrectly entered text, and will return near, or proximate, matches, based on the confidence rating set by the user via the slider-bar. OFAC does not provide recommendations with regard to the appropriateness of any specific confidence rating. Sanctions List Search is one tool offered to assist users in utilizing the SDN List and/or the various other sanctions lists; use of Sanctions List Search is not a substitute for undertaking appropriate due diligence. The use of Sanctions List Search does not limit any criminal or civil liability for any act undertaken as a result of, or in reliance on, such use.

Download the SDN List | Sanctions List Search: Rules for use | Visit The OFAC Website

Download the Consolidated Non-SDN List | Program Code Key

**Details:**

| | | | |
|---|---|---|---|
| **Type:** | Entity | **List:** | Non-SDN |
| **Entity Name:** | CHINA UNICOM (HONG KONG) LIMITED | **Program:** | CMIC-EO13959 |
| | | **Remarks:** | (Linked To: CHINA UNITED NETWORK COMMUNICATIONS GROUP CO., LTD.) |

**Identifications:**

| Type | ID# | Country | Issue Date | Expire Date |
|---|---|---|---|---|
| Equity Ticker | CHU US | | | |
| Equity Ticker | 762 HK | | | |
| Equity Ticker | XCIA DE | | | |
| Equity Ticker | K3ID SG | | | |
| Equity Ticker | XCI DE | | | |
| Issuer Name | China Unicom (Hong Kong) Limited | | | |
| ISIN | US16945R1041 | | | |
| ISIN | HK0000049939 | | | |
| Target Type | Public Company | | | |
| Effective Date (CMIC) | 02 Aug 2021 | | | |
| Purchase/Sales For Divestment Date (CMIC) | 03 Jun 2022 | | | |
| Listing Date (CMIC) | 03 Jun 2021 | | | |

**Aliases:**

| Type | Category | Name |
|---|---|---|
| f.k.a. | strong | CHINA UNICOM LIMITED |

**Addresses:**

| Address | City | State/Province | Postal Code | Country |
|---|---|---|---|---|
| 75th Floor, The Center, 99 Queen's Road Central | Hong Kong | | | China |

Back

SDN List last updated on: 7/15/2026 11:01:45 AM
Non-SDN List last updated on: 1/8/2026 10:05:51 AM

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| China Unicom (Americas) Operations Limited | ) | GN Docket No. 20-110; |
| | ) | ITC-214-20020728-00361; |
| | ) | ITC-214-20020724-00427 |
| | ) | |
| | ) | |
| | ) | |

## ORDER ON REVOCATION

**Adopted: January 27, 2022** **Released: February 2, 2022**

By the Commission: Chairwoman Rosenworcel and Commissioners Carr and Starks issuing separate statements.

## TABLE OF CONTENTS

Heading Paragraph #

I. INTRODUCTION .......... 1
II. BACKGROUND .......... 3
III. DISCUSSION .......... 20
A. Standard of Review .......... 21
1. Commission Authority .......... 21
2. Applicable Standard of Proof .......... 25
3. Public Interest Standard .......... 27
4. CUA Had Sufficient Notice and Several Opportunities to Be Heard .......... 29
B. Revocation of Section 214 Authority .......... 49
1. The Chinese Government Indirectly Owns and Controls CUA .......... 50
2. CUA's Retention of Section 214 Authority Presents National Security and Law Enforcement Risks .......... 74
3. CUA's Past Representations to the Commission and Congress Support Revocation of its Section 214 Authority .......... 111
C. Mitigation Would Not Address National Security and Law Enforcement Concerns .......... 124
D. Transition Period .......... 130
IV. ORDERING CLAUSES .......... 135

## I. INTRODUCTION

1. In this Order on Revocation (Order), we revoke China Unicom (Americas) Operations Limited's (CUA) domestic and international authority, pursuant to section 214 of the Communications Act of 1934, as amended (Act).[1] Based on our public interest analysis under section 214 of the Act and

---

[1] 47 U.S.C. § 214; *China Unicom (Americas) Corporation*, GN Docket No. 20-110, File Nos. ITC-214-20020728-00361, ITC-214-20020724-00427, Order to Show Cause, 35 FCC Rcd 3721 (IB, WCB, EB 2020) (*Order to Show Cause*); *China Unicom (Americas) Corporation*, GN Docket No. 20-110, File Nos. ITC-214-20020728-00361, ITC-214-20020724-00427, Order Instituting Proceeding on Revocation, 36 FCC Rcd 6319 (2021) (*Institution Order*);
(continued….)

**STATEMENT OF
COMMISSIONER GEOFFREY STARKS**

Re: *China Unicom (Americas) Operations Limited*, GN Docket No. 20-110, ITC-214-20020728-00361; ITC-214-20020724-00427

From the basic convenience of wireless calling to the promise of the metaverse, advanced communications and information service technologies are transforming every aspect of our lives. 5G and other advanced broadband technologies are shifting into a new gear, and the race for 6G is already well underway.

But one byproduct of universal, always-on connectivity is the potential vulnerability it creates. As our networks connect with others around the world, we will inevitably encounter bad actors. We must remain on guard against any efforts to intercept, tamper with, or block our communications.

Today's decision is the latest in a series of FCC actions against such threats, and I fully support it. As our order states, the evidence clearly establishes that China Unicom Americas is subject to the exploitation, influence, and control of the Chinese government. As such, the company is highly likely to be forced to comply with Chinese government requests – including the disclosure of communications by American citizens – without sufficient legal protections and independent judicial oversight. Moreover, the company's actions during this investigation, including its failure to provide accurate and truthful information to the Commission, further demonstrate that China Unicom Americas simply cannot be trusted to provide telecommunications service in the United States. Our decision to revoke the company's authority to provide such service makes us more secure.

But there is more work to do. For example, data centers have become critical parts of the American communications and technologies sectors and are instrumental to new use cases like edge computing. As I've noted previously, however, even after loss of their section 214 authority, companies like China Unicom Americas can continue to offer data center services to American customers. The Department of Homeland Security has warned that these data centers leave their customers vulnerable to data theft for one of the same reasons underlying our decision today – these companies are legally required to secretly share data with the Chinese government or other entities upon request, even if that request is illegal under U.S. law. While the FCC currently lacks jurisdiction to address this potential national security threat, we should work with the Administration and Congress to examine whether the Commission needs broader authority to tackle this and other network security threats.

Thank you to the staff of the International Bureau for their work on this item.

Exclusive news, data and analytics for financial market professionals LSEG

# FCC revokes China Unicom's authorization to operate in U.S.

By **David Shepardson** and **Diane Bartz**

January 28, 2022 10:19 AM GMT+11 · Updated January 28, 2022

Aa




China Unicom's company logo is seen at its branch office in Beijing, China, April 21, 2016.REUTERS/Kim Kyung-Hoon/File Photo GLOBAL BUSINESS WEEK AHEAD PACKAGE SEARCH BUSINESS WEEK AHEAD 17 OCT FOR ALL IMAGES Purchase Licensing Rights

WASHINGTON, Jan 27 (Reuters) - The U.S. Federal Communications Commission (FCC) on Thursday voted to revoke the authorization for China Unicom's (0762.HK) U.S. unit to operate in the United States, citing national security concerns.

The 4-0 vote to revoke the authority that had been granted in 2002 is the latest move by the American regulator to bar Chinese telecommunications carriers from the United States because of national security concerns.

The Reuters Inside Track newsletter is your essential guide during the World Cup. Sign up here.

Feedback

The order requires China Unicom Americas to end domestic interstate and international telecommunications services in the United States within 60 days of the order's publication.

The Chinese Embassy did not immediately respond to requests for comments.

A lawyer for the company released a statement from China Unicom that said the FCC decision was "without any justifiable grounds and without affording the required due process. It added that China Unicom "will proactively protect the rights and interests of the company and its customers."

The FCC said China Unicom Americas is ultimately owned and controlled by the Chinese government and provides mobile virtual network operator services and international private leased circuit and Ethernet private line services along with IP transit, cloud and resold services in the United States.

FCC Chairwoman Jessica Rosenworcel said since the approval "the national security landscape has shifted and there has been mounting evidence - and with it, a growing concern - that Chinese state-owned carriers pose a real threat to the security of our telecommunications networks."

The FCC said China Unicom's "responses were incomplete, misleading, or incorrect."

Rosenworcel noted that last year the FCC published the first-ever list of communications equipment and services that pose an unacceptable risk to national security. This month, she wrote to the Commerce Department, the FBI, the Office of the Director of National Intelligence, and other agencies in order to update that list.

FCC Commissioner Geoffrey Starks said China Unicom "can continue to offer data center services to American consumers" despite the revocation.

He said the FCC and Congress should examine this issue and determine whether the commission needed broader authority to address security concerns posed by the centers.

The FCC began making efforts in March to revoke the authorization for China Unicom, Pacific Networks and its wholly owned subsidiary ComNet.

In October, the FCC revoked the U.S. authorization for China Telecom (Americas), saying it "is subject to exploitation, influence and control by the Chinese government." The Chinese failed to win an appeal of the decision.

In 2019, the FCC rejected China Mobile Ltd's (0941.HK) bid to provide U.S. telecommunications services, citing national security risks.

Reporting by David Shepardson and Diane Bartz; Editing by Edmund Blair, Mark Porter, Jonathan Oatis and Bernard Orr

Our Standards: **The Thomson Reuters Trust Principles.**

Suggested Topics: Media & Telecom

Purchase Licensing Rights

**Diane Bartz**
Thomson Reuters

Focused on U.S. antitrust as well as corporate regulation and legislation, with experience involving covering war in Bosnia, elections in Mexico and Nicaragua, as well as stories from Brazil, Chile, Cuba, El Salvador, Nigeria and Peru.

## Read Next




Media & Telecom
EXCLUSIVE
**Lionsgate Studios attracts takeover interest from Bollore, Banijay, sources say**




World
**Writers Guild sues to block Paramount deal, saying it would hurt writers**




World
**UK's Reform calls for 'full security' for lawmakers after politician's murder**



Business
**Buffett says his children are ready to distribute his fortune, calls Bill Gates' Epstein ties 'distasteful'**

Technology
**Apple Intelligence AI service registered with Chinese cyberspace regulator**

Feedback

# Rackscentral wins prestigious "Unicom Global Partner Award" at China Unicom International Partners Meeting 2022

June 28, 2024

In a remarkable achievement, Racks Central has been honored with the "Best Innovative Solutions Partner Award" under the Cloud and Data Center category at the esteemed China Unicom International Partners Meeting 2022. This accolade, part of the Unicom Global Partner Awards, is a testament to Racks Central's dedication to innovation and excellence in the ever-evolving cloud and data center landscape.

Held in 2022, the China Unicom International Partners Meeting brought together industry leaders, innovators, and global partners to discuss advancements and foster collaboration in telecommunications, cloud computing, and data infrastructure. The award ceremony was one of the event's highlights, recognizing exceptional contributions from partners across various domains.

Racks Central's receipt of this award underscores its commitment to delivering cutting-edge solutions tailored to meet the dynamic needs of businesses. By leveraging state-of-the-art technologies and a customer-centric approach, the company has set new benchmarks in the cloud and data center industry.

"This award is a significant milestone for Racks Central," said Bobby Wee, CEO Racks Central. "Being recognized by a global telecommunications leader like China Unicom is a testament to our team's relentless pursuit of innovation and excellence. It also motivates us to continue pushing boundaries in providing transformative solutions for our clients."

China Unicom, a global telecommunications giant, has consistently emphasized the importance of innovation and strategic partnerships in driving growth and meeting the demands of the digital era. Through the Unicom Global Partner Awards, the company celebrates outstanding contributions from its partners who help shape the future of technology and connectivity.

As a trusted partner of China Unicom, Racks Central's achievements reflect a shared vision for a connected and technologically advanced future. The "Best Innovative Solutions Partner Award" acknowledges not just the solutions delivered but the collaborative spirit and forward-thinking approach that define the partnership.

Moving forward, Racks Central is poised to build on this success, continuing to innovate and expand its portfolio of cloud and data center services. The company remains committed to empowering businesses with scalable, secure, and efficient solutions, solidifying its reputation as a leader in the global tech ecosystem.

**About Racks Central**

Racks Central is a leading provider of cloud and data center solutions, offering a comprehensive range of services designed to support businesses in their digital transformation journeys. With a focus on innovation, reliability, and customer satisfaction, Racks Central is dedicated to enabling businesses to achieve their goals in a rapidly evolving digital landscape.

**About China Unicom**

China Unicom is a globally renowned telecommunications operator, providing integrated information and communications services. The company is committed to driving innovation and excellence, fostering global partnerships, and leading the charge in the digital transformation of industries worldwide.

← Previous
Racks Central Expands Data Center Capacity with Landmark Acquisition in Iskandar Halal Park, Johor

Next →
Rackscentral's Commitment to a Climate-Neutral Future

2025 Racks Central Pte Ltd. All Rights Reserved.

JOHN MOOLENAAR, MICHIGAN
CHAIRMAN
ROB WITTMAN, VIRGINIA
ANDY BARR, KENTUCKY
DAN NEWHOUSE, WASHINGTON
DARIN LAHOOD, ILLINOIS
NEAL DUNN, FLORIDA
DUSTY JOHNSON, SOUTH DAKOTA
ASHLEY HINSON, IOWA
CARLOS GIMENEZ, FLORIDA
GUS BILIRAKIS, FLORIDA
YOUNG KIM, CALIFORNIA
NATHANIEL MORAN, TEXAS
ZACH NUNN, IOWA

Congress of the United States
House of Representatives
SELECT COMMITTEE ON THE CHINESE COMMUNIST PARTY

RAJA KRISHNAMOORTHI, ILLINOIS
RANKING MEMBER
KATHY CASTOR, FLORIDA
ANDRÉ CARSON, INDIANA
SETH MOULTON, MASSACHUSETTS
RO KHANNA, CALIFORNIA
MIKIE SHERRILL, NEW JERSEY
HALEY STEVENS, MICHIGAN
RITCHIE TORRES, NEW YORK
SHONTEL BROWN, OHIO
GREG STANTON, ARIZONA
JILL TOKUDA, HAWAII

March 3rd , 2025

He Biao
China Mobile International Limited
21680 Gateway Center Dr Suite 268
Diamond Bar, CA

Dear Mr. Biao,

We write to address serious and ongoing national security concerns regarding China Mobile's potential activities in the United States, which pose a risk to the security and privacy of Americans' communications and networks.

In 2019, the Federal Communications Commission (FCC) denied China Mobile's U.S. Section 214 license because the company threatened the privacy and security of Americans' communications and U.S. national security due to the company's role as a State Owned Enterprise (SOE).[1] The FCC stated "the Chinese government's policy of intertwining Chinese state-owned enterprise resources with intellectual property theft and economic espionage, along with the Chinese government's ongoing intelligence activities targeting the United States, presents too great of a risk in light of the fact that 'China Mobile Communications Company—and by extension, its subsidiary [China Mobile USA]—as a prominent Chinese SOE cannot be expected to act against the interest of the Chinese government on any sensitive manner.'"[2] Information made available to the Committee has also revealed network activity, which may be indicative of industrial control system targeting and scanning from China Mobile's systems.[3] Just two months ago, the Biden Administration issued a notice finding that China Mobile's residual operations in the United States continue to pose a national security threat.[4]

---

[1] China Mobile Int'l (USA) Inc., Memorandum Opinion and Order, FCC 19-38,(May 10, 2019), https://docs.fcc.gov/public/attachments/FCC-19-38A1.pdf.
[2] *Id.*
[3] ICS Network Activity Report: Feb. 17–23, 2025 (Feb. 2025) (confidential report) (on file with the Committee).
[4] David E. Sanger, Biden Administration Takes First Step to Retaliate Against China Over Hack, New York Times (Dec. 16, 2024), https://www.nytimes.com/2024/12/16/us/politics/biden-administration-retaliation-china-hack.html ; Alexandra Alper, Exclusive: US Probing China Telecom, China Mobile over Internet, Cloud Risks, Reuters (June 25, 2024), https://www.reuters.com/business/media-telecom/us-probing-china-telecom-china-mobile-over-internet-cloud-risks-2024-06-25/.

The Committee has received information indicating that China Mobile may continue to maintain network Points of Presence (PoPs), data center access, and cloud-related offerings in the United States, potentially through subsidiaries or affiliates. Under the PRC's National Intelligence Law, Chinese state-owned enterprises and other purportedly private businesses can be compelled to assist with intelligence activities.[5] China Mobile's ongoing U.S. operations—particularly in internet backbone exchanges and cloud computing environments—could therefore allow unauthorized data access, espionage, or sabotage by the Chinese Communist Party (CCP).

China Mobile's documented connections to PRC intelligence raise urgent national security questions in light of the Chinese government's increasingly aggressive attacks on U.S. telecommunications networks. PRC-linked Salt Typhoon, described by a former Chairman of the Senate Select Committee on Intelligence as "the worst telecom hack in our nation's history" compromised sensitive data of millions of Americans.[6] Volt Typhoon, tied to China's Ministry of State Security, is waging what the FBI calls China's "most significant cyber-espionage campaign in history," infiltrating U.S. critical infrastructure and telecommunications equipment and inserting malware that could cause physical harm to Americans.[7]

China Mobile also appears to play a significant role in facilitating cyber-enabled espionage and data exfiltration for CCP-linked global cyber operations. Reporting indicates that China Mobile, along with China Unicom and China Telecom, has signed formal agreements with cybercriminal actors that enable access to sensitive data.[8] These arrangements suggest an active role by China Mobile and its affiliates in fostering illicit relationships with cyber threat actors. Such collaborations allow criminal entities to trade stolen data more efficiently, shield their activities from detection, and continue cyber-enabled operations against international targets, including U.S. businesses and government entities.

Reports indicate that China Mobile's network infrastructure has been leveraged by PRC-affiliated cybercriminals to facilitate large-scale data theft, often involving critical personal, corporate, and government data.[9] The illegal data trade network, estimated to be worth over 150 billion yuan, continues to thrive due to the ease with which threat actors exploit international communication channels.[10] In some cases, compromised software development kits (SDKs), which are integrated into widely used applications, serve as persistent access points for continued

---

[5] Rogier Creemers, Graham Webster & Paul Triolo, Translation: *Cybersecurity Law of the People's Republic of China (Effective June 1, 2017),* DigiChina (June 29, 2018), https://digichina.stanford.edu/work/translation-cybersecurity-law-of-the-peoples-republic-of-china-effective-june-1-2017/.
[6] Mike Brest, *Senate Intel chairman call Chinese hack 'worst' in 'nation's history'"*, Washington Examiner (Nov. 22, 2024), https://www.washingtonexaminer.com/policy/defense/3238943/senate-intel-chairman-chinese-hack-worst-nation-history/.
[7] Andy Greenberg, "*China's Salt Typhoon Spies Are Still Hacking Telecoms—Now by Exploiting Cisco Routers*," Wired (Feb. 13, 2025), https://www.wired.com/story/chinas-salt-typhoon-spies-are-still-hacking-telecoms-now-by-exploiting-cisco-routers/.
[8] Kyla Cardona & Ashley Allocca, *"Pantsless Data": Decoding Chinese Cybercrime TTPs*, SpyCloud (Feb. 26, 2024), https://spycloud.com/blog/growing-chinese-threat-actor-ecosystem/.
[9] *Id.*
[10] *Id.*

data extraction.[11] The infrastructure provided by China Mobile has been observed in facilitating these operations, enabling PRC cyber actors to disguise their activities and obfuscate attribution.[12]

We therefore write today to request detailed information about China Mobile's continued operations in the United States to assess the risks such activities pose to American national security. Specifically, we request that you provide the following information by March 31st , 2025:

1) Documents and records that provide a complete and comprehensive record of all of China Mobile's physical or virtual infrastructure and related offerings in the United Sates.
   a) Please produce documents and records that provide a comprehensive and detailed explanation of the PoPs, data center facilities, partnerships, and other physical or virtual infrastructure that China Mobile and its subsidiaries and affiliates operate within the United States.
2) All documents, records, agreements, contracts, or similar materials between China Mobile or one of its subsidiaries or affiliates to provide internet, cloud connectivity, or enterprise services to customers in the United States.
   a) These documents and records should include all contracts, agreements, or similar materials related to direct connect services with major U.S. cloud providers.
3) All documents, records, and communications related to any internal or external investigations, audits, or incident reports conducted in the past three years regarding inadvertent or intentional rerouting of U.S. internet traffic through Chinese networks or unauthorized data access at China Mobile or one of its subsidiaries or affiliates.
4) All documents, records, and communications related to your company's compliance with the FCC revocation order and any other relevant instructions from U.S. agencies, including timelines and correspondence.
5) All documents, records, and communications related to all protocols your company has in place to prevent unauthorized access, interception, or manipulation of data traversing your U.S. networks, including any cloud computing services operated by China Mobile. Explain any steps taken to ensure U.S. customer data is stored and protected in compliance with American laws.
6) **PRC government contracts:**

[11] *Id.*
[12] *Id.*

a) Does your company or its parent or any affiliate or subsidiary of your company or its parent have any current contracts with the PRC government? If so, please produce a copy of all such agreements.

b) Has your company or its parent or any affiliate or subsidiary of your company or its parent had any contracts with the PRC government over the last five years? If so, please produce a copy of all such agreements.

c) Has your company entered into any research agreements with any entity that is subject to the direction or control of the PRC government or one of its organs? If so, please produce documents and information sufficient to provide detailed information about such research agreements.

d) Has the PRC government —through a contractual mechanism, regulatory requirement, or formal or informal request, or any other means— ever requested that you or your parent or a subsidiary or affiliate of your company or your parent company modify the products or services provided by your company, its parent, or a subsidiary or affiliate of your company or its parent? Please produce documents and information sufficient to explain the modification requested and the reason for such modification.

e) Has your company or its parent or an affiliate or subsidiary of your company or its parent received any PRC government or CCP awards, honors, or subsidies of any kind? Please produce documentation of the award, honor, or subsidy and records verifying the total amount received and conditions of receipt, if any.

7) **Collaboration with PRC military, intelligence authorities or blacklisted entities:**

a) Please describe with specificity any engagement, partnership, research or contractual relationship, or other relationship between your company (parent/subsidiary/affiliate) and any of the following. For each relationship, produce documents or information sufficient to identify the key officials with whom your company (parent/subsidiary/affiliate) engaged. Please also produce all documents describing such engagement, research, or contractual or other formal relationship.

i) The People's Liberation Army and any of its components or subordinate entities;

ii) The Ministry of National Defense and any component or subordinate entities;

iii) The Central Military Commission and any component or subordinate entities;

iv) The Ministry of State Security and any component or subordinate entities; or

v) The Ministry of Public Security and any component or subordinate entities.

b) Please list all meetings that your company (or parent/subsidiary/affiliate) has had with officials from any of the above-listed entities in the past five years, including the names and titles of all relevant participants.

c) Does your company (or parent/subsidiary/affiliate) have any contractual relationships—including customer agreements, supplier or sub-tier supplier agreements, or research collaborations—with any PRC entities listed on a U.S. government blacklist, including Section 1260H of the 2021 National Defense Authorization Act (NDAA), Bureau of Industry and Security (BIS) Entity List, Uyghur Forced Labor Prevention Act (UFLPA) Entity List, Commerce Department's Military End User List, Executive Order 14059, Specially Designated Nationals and Blocked Persons (SDN) List, Non-SDN Chinese Military-Industrial Complex (NS-CMIC) Companies List, etc.? If so, please produce all such agreements.

d) Has your company (or parent/subsidiary/affiliate) collaborated with any PRC entities on defense or intelligence-related research? If so, please describe the nature of that collaboration and produce all relevant documentation establishing or governing that relationship.

e) Has your company (or parent/subsidiary/affiliate) purchased any products from U.S. companies that require an export license? If so, please produce all relevant documentation related to such purchases, including licensing information and information related to the end use of such products.

f) Has your company participated in any programs, partnerships, collaborations, or other initiatives associated with China's Military-Civil Fusion strategy? If so, please produce all documents related to such participation and the names of the individuals and organizations with whom that participation occurred.

g) Has your company participated in any programs, partnerships, collaborations, or other initiatives associated with China's Belt and Road Initiative? If so, please produce all documents related to such participation and the names of the individuals and organizations with whom that participation occurred.

8) **Chinese Communist Party links:**

a) Please produce a list of all employees of China Mobile International Limited, the company's parents, and affiliates who are members of the CCP.

b) Please produce a list of all individuals on your company (or its parent/subsidiary/affiliates) internal CCP committee. Please identify the leadership of the committee including names and titles.

c) Do any of your employees who are CCP members hold a position in any CCP party organizing body at the national, state, or local level? Please identify the relevant individuals, their positions at your company (parents/subsidiary/affiliate), and their role in the relevant Party entity.

d) Please describe with specificity all engagements your company (or parent/subsidiary/affiliate etc.) has had with the CCP and its representative bodies. Please produce a list of all meetings with CCP national or regional officials within the last five years. Please include the nature of the engagement, topic(s) discussed or addressed, the names of the corporate representatives and CCP officials who attended the relevant engagement, and their respective titles.

The House Select Committee on the Strategic Competition Between the United States and the Chinese Communist Party has broad authority to investigate and submit policy recommendations on countering the economic, technological, security, and ideological threats of the Chinese Communist Party to the United States and allies and partners of the United States under H. Res. 5 Sec. 4(a).

We appreciate your prompt attention to this matter and your full cooperation by March 31st 2025. Should you have any questions or wish to discuss this request, please contact the Committee majority and minority staff at (202) 226-9678 and (202) 225-2489, respectively.

Sincerely,





John Moolenaar
Chairman

Raja Krishnamoorthi
Ranking Member

DATA CENTERS

# Singapore SG4

Singapore SG4 colocation and data centre is the ideal choice for deploying colocation on the east side of Singapore and provides seamlessly connect to the richest ecosystems in network, cloud, financial and payment, enterprise and peering exchanges.

Tech specs | Book a tour →



**Address**
7 Tai Seng Drive
Singapore, 535218
Singapore

USEFUL LINKS
Contact support
Speak to sales




### Space
Accelerate time-to-market with our vast, global data center footprint delivering scalable capacity that evolves with your business needs.

**90,847**
Square feet (ft²)

### Power
Safeguard operations and prevent outages with enterprise-grade uninterruptible power supply (UPS) systems and built-in redundancy.

**2N**
Power redundancy

### Advanced Cooling
Support AI and high-density workloads with next-gen cooling solutions that boost performance and efficiency while prioritizing sustainability.

**N+1**
Cooling redundancy

### Reliability
Mitigate risk with resilient infrastructure, robust disaster recovery and an industry-leading uptime track record of 99.999%+ globally.

**99.9999%+**
Global Guaranteed Uptime

## Certified to global standards

Our data centers meet rigorous global benchmarks for energy efficiency and environmental responsibility.

View all certifications

- Green Mark
- ISO 14001
- ISO 22301
- ISO 27001
- ISO 50001
- ISO 9001
- OSPAR
- PCI DSS
- SOC 1 Type II
- SOC 2 Type II
- SS 564
- TVRA

## Singapore SG4 specifications

Print tech specs

Building | Facilities | Sustainability | Products

**Data Centers**
- Secure Cabinet Express
- Private Cage
- Equinix Flex Space
- Smart Hands*
- Equinix Smart Build

**Interconnection**
- Equinix Internet Exchange
- Equinix Internet Access
- Metro Connect
- Cross Connects

**Digital Services**
- Equinix Fabric
  - Fabric Cloud Router
  - Equinix Precision Time
- Network Edge

## Nearby Data Centers

Discover other Data Center locations in or near Singapore SG4.

Why colocate in Singapore?

### SG1
Learn more about the security, power and cooling options provided by Equinix Singapore SG1 Data Center located at 20...

### SG2
Learn more about the security, power and cooling options provided by Equinix Singapore SG2 Data Center located at 15...

### SG3
Learn about Equinix SG3 Internet Exchange located at 26A Ayer Rajah Crescent. See our interconnection options, certif...

### SG5
Deploy in Equinix's interconnected Singapore SG5 data centers located at 6 Sunview Drive, Singapore 627488, to the ta...

## Ever wondered how Equinix connects the world?

Equinix powers innovation with interconnection at scale through the world's largest data center network. Our global presence across six continents enables seamless, scalable connectivity.

Book a tour → | Contact sales



© 2026 Equinix Inc.


2 Tai Seng Ave
Restaurants
Hotels
Things to do
Public transport
Parking
Chemists
ATMs
Saved
Recents
Singapo...
Sydney
Loudoun County ...
Madison
Java
View more
Get app
StarHub Office
3 Tai Seng Drive Space for Rent
Yew Lee Metal Works Pte
EBENEX (EBX) Select Shop: Guitar Boutique
Used musical instrument store
Air Express Centre
DHL Express Service Point (East...
Talent Music Pte
China Mobile International Singapore...
Global Switch Singapore Tai Seng
Tai Seng Dr
Tai Seng Ave
Airport Rd
Eunos Link
Volt Charging station
Visionary Interior Design Pte. Ltd
Public transport
Click on stations for more information
Imagery ©2026 Airbus, Imagery ©2026 Airbus, Maxar Technologies, Map data ©2026 Google
Australia
Terms
Privacy
Send product feedback
20 m
3D